**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **James Daugherty,** | ) | **CASE NO. 1:05 CV 2787** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Sajar Plastics, Inc.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

### Introduction

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 31).  This case alleges a violation of the Americans with Disabilities Act.  For the following reasons, the motion is GRANTED.

### Facts

Plaintiff, James Daugherty, filed this Complaint against defendant, Sajar Plastics, Inc., in the Geauga County Common Pleas Court.  The case was thereafter removed to this Court on the basis of federal question jurisdiction.

Defendant is in the business of developing and manufacturing plastic injection

1

molding components for use in the medical and banking industries.  Plaintiff was hired by defendant in 1999 as a maintenance technician, repairing "anything that needed to be repaired, be it mechanical, hydraulic, electrical, pneumatic, building, whatever broke." (pltf. depo. 25)

Beginning in 2000 or 2001, plaintiff began suffering from back problems.  At that time, plaintiff began taking OxyContin and Duragestic patches for his back pain, as prescribed by his treating physician, Dr. Peter Franklin.  Plaintiff informed his supervisors that he was taking these medications and that his doctor had advised him that he would need to get "acclimated" to the drugs.  As a result, for several months plaintiff asked not to perform major electrical work.  Once he adjusted to the drugs, he returned to all his duties.  (*Id.* 63-64, 82-86)         Plaintiff periodically requested leave under the Family and Medical Leave Act (FMLA) when his back problems flared up.  The length of these leaves ranged from a day or two days, to a week or two weeks. Defendant never denied plaintiff his requests for intermittent FMLA leave.  (pltf. depo. 45, 64-65; Ronald Alexander depo. 28-34; Ranae Cozzone depo. 14) According to plaintiff, however, Ron Alexander, defendant's human resource director, told plaintiff that if plaintiff "didn't do something to get on disability, [he] would not have a job" and Alexander "was always saying [plaintiff] was missing too much time" and "I couldn't keep missing days; they needed someone there to do the work."  (pltf. depo. 38, 40, 60)

In November 2003, plaintiff requested FMLA leave for a period of close to two months.  His doctor indicated a return to work date of January 5, 2004.  Plaintiff figured that a longer block of time would enable his back to heal better, and he would not have to take as

2

much intermittent time. The request was granted by defendant. (Doc. 33 Ex. 7; pltf. depo. 89) Plaintiff testified that just prior to beginning his FMLA leave, Ron Alexander told plaintiff that there would not be a job waiting for him when he returned from leave. (pltf. depo. 44-45)

According to Ranae Cozzone, defendant's human resources manager, defendant experienced a layoff after plaintiff went out on his FMLA leave. Plaintiff, as the least senior maintenance technician, was chosen for layoff among other employees in other departments. Plaintiff was notified at the end of December 2003 of the decision to lay him off, effective on his return to work date. (Cozzone depo. 19-21, Doc. 33 Ex.9)

In mid-February 2004, defendant determined that it needed another maintenance technician. Consequently, Ron Alexander directed Ranae Cozzone to call plaintiff. (Cozzone depo. 22; Alexander depo. 46)

Due to plaintiff's history of back problems and intermittent leaves, Alexander requested that plaintiff be examined by Dr. Altemus, a physician used by defendant, to ensure that plaintiff was physically able to return to work. Defendant needed a maintenance technician "as soon as possible" and needed to know if someone other than plaintiff should be hired for the position in the event plaintiff was physically unable to perform the work. (Alexander depo. 47-49)

On February 17, 2004, Dr. Altemus examined plaintiff and in a letter to defendant on that date wrote in pertinent part:

> In summary, [plaintiff] appeared fit with no apparent problems pertinent to his joints or back. He had no problems with the rigors of the physical examination. However, there were current medication patches affixed to his back and several residual stains of previous patches. The patient was forthcoming with his admission of daily Oxycontin oral medication and daily Duragestic (Fentanyl) transdermal medications. Both of these medications are Class II narcotics.

3

> In my opinion, [plaintiff] would be able to successfully complete the duties commensurate with the job description provided me.  But, because of the significant medication taken on a daily basis (both in type and strength), I do not feel comfortable in approving this man's reemployment at this time.  The analgesics may mask the symptoms of a reinjury thus exacerbating his current disease or, more importantly, the amount of medication may cause an impairment of perception of judgment which might lead to an injury to himself or others.

(Doc. 33 Ex. 13) Cozzone then contacted plaintiff by telephone, informed him of Altemus's findings and told him that if he could provide documentation that his medication had been reduced or that he had been taken off the medication, the company would take a look at it. (Cozzone depo. 29-31)

Shortly thereafter[1], Dr. Franklin provided a statement to defendant: "TO WHOM IT MAY CONCERN: Mr. Daugherty is stable on long term opoid management for chronic pain and is able to do the same work he has been doing on this medication in recent years."  (Doc. 33 Ex. 16)

On March 18, 2004, Cozzone received a telephone call from plaintiff who stated that his physician had reduced his medication.  Cozzone asked plaintiff to provide a statement from his doctor stating what medication he was on and the quantity of dosage.  Plaintiff informed Cozzone that his attorney told him that he did not need to provide that information to anyone.  (Doc. 33 Ex. 18) Plaintiff did not provide any such statement.  (pltf. depo. 79; Alexander depo. 59; Cozzone depo. 31)

By letter of April 22, 2004, Alexander advised plaintiff that on two occasions plaintiff had been notified to supply defendant with a note from his doctor supporting plaintiff's claim that he is no longer taking medications that would restrict him from employment with

---

[1] It appears this notice was sent by fax on February 19, 2004.

defendant. Further,

> As of this date, we still have not seen a note from your Physician. However, on or about April 5, 2004 you called our offices and left a voice mail message with Ranae Cozzone and requested her to call your Doctor direct for the information which we asked you to obtain.
>
> Please understand, this office has requested twice, that you provide us with specific information relating to your medical condition. We are not going to gather this information for you.
>
> As i[t] stands currently, this office has no information which changes your employment status. In fact, you were to supply this office with the above mentioned information on or before April 2, 2004. Here it is April 22, 2004, and you still have not provided anything to support your claim that you are able to return to work. Since our request to you for information from your Doctor, an opening has occurred during the period of April 2, 2004, and April 19, 2004. Since you did not respond to our request in a timely fashion, we filled the position. If you want to be available for the next opening, I would suggest you supply this office with the requested information.

(Doc. 33 Ex. 19)

On May 12, 2004, plaintiff filed his EEOC charge alleging disability discrimination. Because plaintiff did not return to work within six months of being placed on layoff status, his employment has terminated. (Cozzone depo. 37; Doc. 33 Ex. 22)

Plaintiff filed this Complaint on November 3, 2005, setting forth three claims. Count One alleges a violation of the Americans with Disabilities Act. Count Two alleges disability discrimination under Ohio law. Count Three alleges retaliation for taking FMLA leave.

This matter is now before the Court upon defendant's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

5

8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Discussion

**(1) ADA**

The ADA prohibits discrimination in employment against a qualified individual with a disability because of the disability. 42 U.S.C. § 12112(a). To establish a violation under the ADA, a plaintiff must prove: "(1) he has a disability; (2) that he is otherwise qualified for the job; and (3) that defendants either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability." *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir.1997)

With regard to the first element, the ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Claims under the Ohio handicap discrimination law may be analyzed in the same manner as those brought under the ADA. *Knapp v. City of Columbus,* 2006 WL 1878332 (6th Cir. July 6, 2006) (citations omitted).

Defendant argues that plaintiff is not disabled. The Sixth Circuit has recapped the

7

meaning of disability:

> Proof of a disability is a threshold requirement to prove a violation of the ADA. *Burns v. Coca-Cola Enterprises, Inc*., 222 F.3d 247, 253 (6th Cir.2000). A disability, with respect to an individual, is defined within the ADA as a physical or mental impairment that substantially limits one or more of the major life activities of such individual. 42 U.S.C. § 12102(2)(A). Merely having an impairment does not make one disabled for purposes of the ADA. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002) 'Substantially limits' has been suggested to mean 'considerable' or to 'a large degree.' *Id.* at 196. 'Major life activities' refers to those activities that are of central importance to daily life. *Id.* at 197. Although there is no exhaustive list of activities, the Supreme Court has cited to the Rehabilitation Act regulations, which defines major life activities to include functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 45 C.F.R. § 84.3(j)(2)(ii); *Williams,* 534 U.S. at 195. These terms must be interpreted strictly to create a demanding standard for qualifying as disabled. *Id*. The Act requires the existence of a disability to be determined on a case-by-case manner. *Id*. at 198; 42 U.S.C. § 12101(2).

*Gerton v. Verizon South Inc*., 145 Fed.Appx. 159, 164-165 (6th Cir. 2005).

Defendant argues that plaintiff cannot demonstrate that his impairment, a bad back, substantially limits a major life activity. Defendant points to plaintiff's deposition testimony:

> Q. How does your back affect your work performance?
>
> A. I'm sure it slows me down. It makes it hard for me to bend, it makes me a little slower. I can't lift as much. I have to be more careful at what I do.
>
> \*\*\*
>
> Q. What does [your back problem] prevent you from doing?
>
> A. It depends on if it's exacerbated, or in a situation like I am now. Today, it won't stop me from doing much. It will bother me, if I do certain things, but I will do it anyway, because I'm not too smart. But when it's really aggravated, it stops me. Sometimes, there's been times I couldn't walk. I've had to crawl to go to the bathroom. It depends on where my back it at, at that time.
>
> \*\*\*
>
> Q. Is there anything at home or away from the job that your back problem prevents you from doing?

8

  A. Yes.

  Q. What are those things?

  A. Again, when it's aggravated, I can't ride a motorcycle, mow the lawn. It's like anything else, depending on the degree of what position it's at, how bad it is, there's certain things I can do and there's certain things I can't.

(pltf. depo. 63-64, 72)

  The Sixth Circuit has stated that the physical impairment of a bad back does not qualify a person for ADA disability status. *Agnew v. Heat Treating Services of America,* 2005 WL 3440432 (6th Cir. Dec. 14, 2005). *See also Adams v. Potter,* 2006 WL 2431118 (6th Cir. Aug. 22, 2006) (citations omitted) (Although the court stated that it did not have to "resolve the appropriate contours of the disability definition when applied to those with back injuries," it recognized that the Seventh Circuit has stated, "The number of Americans restricted by back problems is legion. They are not disabled.")

  Apparently recognizing that he is unable to establish that his physical impairment of a bad back does not substantially limit a major life activity, plaintiff attempts to get around this deficiency by arguing that the level of his medications renders him substantially limited in the major life activity of *working*. In the absence of demonstrating, however, that he has a physical or mental impairment that substantially limits one or more of his major life activities, plaintiff cannot circumvent the definition of disability by trying to establish it indirectly, i.e., the drugs used to treat his back pain substantially limit him from working.

  Even assuming plaintiff can satisfy the requirement of a physical or mental impairment in such a manner, plaintiff's argument is unpersuasive. Plaintiff points to Dr. Altemus's February 17, 2004 letter following his examination of plaintiff which states in part:

9

> I do not feel comfortable in approving this man's reemployment at this time. The analgesics may mask the symptoms of a reinjury thus exacerbating his current disease or, more importantly, the amount of medication may cause an impairment of perception of judgment which might lead to an injury to himself or others.

The Sixth Circuit has addressed the meaning of being substantially limited in the major life activity of working:

> The ADA regulations state,
>
>> With respect to the major life activity of *working*, the term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.  29 C.F.R. § 1630.2(j)(3)(I).
>
> This Court has repeatedly held that the major life activity of working is not substantially limited simply because an employee's physical or psychological impairment prevents him from performing a particular job. *McKay v. Toyota Motor Mfg. U.S.A.*, Inc., 110 F.3d 369, 373 (6th Cir.1997) (holding that plaintiff's carpal tunnel syndrome, which only prevented her from performing a narrow range of assembly-line jobs, was not an impairment that substantially limited her general ability to work); *Mahon v. Crowell*, 295 F.3d 585, 591-92 (6th Cir.2002) (holding that plaintiff's back problems did not substantially limit his ability to work in a broad class of jobs); *Black v. Roadway Express, Inc.*, 297 F.3d 445, 454-55 (6th Cir.2002) (finding that plaintiff's knee injury did not prevent him from performing a broad class of truck driving jobs); and *Jasany v. United States Postal Service*, 755 F.2d 1244, 1250 (6th Cir.1985) (holding that plaintiff was not substantially limited in life activity of working where plaintiff's eye impairment, although a permanent one which prevented him from performing functions of a postal distribution clerk, did not interfere with his ability to work other jobs).

*Agnew v. Heat Treating Services of America*, 2005 WL 3440432 (6th Cir. Dec. 14, 2005).

Plaintiff asserts that based on Dr. Altemus's opinion, he would be prevented from working in any job where he came in contact with potentially hazardous situations and, therefore, he would be disqualified from a broad range of jobs.

10

Defendant argues that taking prescription medication which may render one unable to work safely does not meet the test of a disability, particularly where these medications can be modified. In fact, defendant points out, plaintiff notified the defendant that his doctor had reduced his medication, but refused to provide a statement from his doctor to that effect.

This Court agrees that plaintiff's reliance on Dr. Altemus's opinion is insufficient to render him disabled from the major life activity of working. By notifying defendant on March 18, 2004 that his doctor had reduced his medication, plaintiff acknowledged that his medication could be reduced to a safe level and he could safely perform his job with this modification. More importantly, plaintiff fails to offer evidence that he could not perform either a class of jobs or a broad range of jobs in various classes. Therefore, he cannot demonstrate he was significantly limited in the life activity of working. *Cartwright v. Lockheed Martin Utility Services, Inc.*, 40 Fed.Appx. 147, 154 (6th Cir. 2002).

Plaintiff also argues that defendant regarded him as being disabled. To establish that he is regarded as having an impairment, plaintiff must show that:

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual--it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Olds v. United Parcel Service, Inc.*, 127 Fed.Appx. 779, 782 (6th Cir. 2005) (citing *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir.2001) ).

Plaintiff argues that based on Dr. Altemus's opinion, defendant perceived plaintiff as being disqualified from a broad range of jobs. Plaintiff also points to his deposition testimony

11

that defendant urged him to get on disability and that it was growing intolerant of the amount of intermittent days off, and Alexander told plaintiff he would not have a job if he took the extended FMLA leave.  Finally, plaintiff points to the deposition testimony of Alexander and Cozzone wherein they stated that they requested Altemus's examination because they needed a maintenance technician right away and, given plaintiff's history of back problems, they wanted to be sure that he was able to perform the job.

      Again assuming that plaintiff can circumvent the requirement of an impairment in this manner, to show that defendant regarded plaintiff as disabled, plaintiff must demonstrate that defendant "mistakenly believed" that the level of plaintiff's medications substantially limited the major life activity of working.  As stated above, however, there is no evidence that defendant perceived plaintiff from being unable to perform either a class of jobs or a broad range of jobs in various classes. Defendant did not believe plaintiff could safely perform the job of maintenance technician while on the current level of medication, but believed he could safely perform his job if the level of medication he was taking was reduced.  Defendant, therefore, requested documentation from plaintiff that his medication had been reduced or that he had been taken off the medication.  Plaintiff did not do so although he apparently could reduce the level of medication as evidenced by his March 18 statement to the defendant to that effect.  While plaintiff points to evidence that defendant was growing impatient with his requests for time off of work due to his back problems and that Alexander threatened that he would not have a job if he took the extended leave, plaintiff does not dispute that his lay off was legitimate and that it was Alexander who subsequently decided to recall plaintiff.  Alexander's and Cozzone's testimony that they requested the physical examination because

of the immediate need to fill the maintenance technician position does not demonstrate a discriminatory motivation. Rather, based on plaintiff's history of back problems, defendant legitimately desired a doctor's opinion as to plaintiff's fitness for his work. The examination revealed that plaintiff's current level of medication was unsafe. Plaintiff then provided an oral statement to defendant that his medication had been reduced but never provided the requested documentation although given another chance to do so, as evidenced by defendant's April 22 letter to plaintiff.

For these reasons, plaintiff has not demonstrated that he is disabled.

Assuming plaintiff is disabled, he argues that defendant failed to reasonably accommodate him. The Court disagrees.

Plaintiff contends that Dr. Altemus testified that he would have approved plaintiff's employment were a number of job duties removed from his job description but that defendant never discussed this possibility with him, and that Alexander testified that the company would not consider such alterations. As such, plaintiff concludes that defendant failed to engage in its duty to make a good faith attempt to identify and implement reasonable accommodations and engage in an interactive process with plaintiff once it determined he was unable to perform his job because of the medications he took. Rather than engaging in the process, plaintiff asserts, defendant simply terminated plaintiff's employment.

Defendant, however, had no duty to engage in the interactive process because plaintiff never requested a reasonable accommodation. While it is possible for an employer to violate the ADA by failing to engage in a good faith interactive process, "the burden remains on the employee to request an accommodation." *Lockard v. General Motors Corp.,* 52 Fed. Appx.

13

782 (6th Cir. 2002). Where a plaintiff never triggers the employer's duty to engage in an interactive search for a reasonable accommodation, the duty does not arise. *Id.*

There is no evidence that plaintiff requested a reasonable accommodation but, in fact, indicated to defendant that his medication had been reduced as had been requested. Plaintiff thereafter refused to provide his doctor's statement, as required by defendant. Nor did he supply the information even following defendant's April 22, 2004 letter providing him one more opportunity to do so.

For these reasons, summary judgment is warranted on Counts One and Two.

**(2) FMLA Retaliation**

Plaintiff asserts that he was retaliated against for taking FMLA leave. "An employer is prohibited from discriminating against employees who have used FMLA leave, nor can they 'use the taking of FMLA leave as a negative factor in employment actions.' This prohibition includes retaliatory discharge for taking leave." *Arban v. West Pub. Corp.*, 345 F.3d 390, 403 (6th Cir. 2003) (citing 29 C.F.R. § 825.220(c) and *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir.2001) ).

The *McDonnell Douglas* burden shifting analysis is utilized in evaluation of such claims. To establish a prima facie case of retaliatory discharge, plaintiff must prove that: (1) he availed himself of a protected right under the FMLA by notifying defendant of his intent to take leave; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the protected activity and the adverse employment action. *McConnell v. Swifty Transp., Inc*., 2006 WL 2457077 (6th Cir. August 23, 2006) (citing *Skrjanc,* 272 F.3d at 314). The burden then shifts to defendant "to come forth with a legitimate, nondiscriminatory

14

reason for [plaintiff's] discharge." *Id.*  Plaintiff must then show that the reason is pretextual "in one of three ways: first, by showing that the proffered reasons had no basis in fact; second, by showing that the proffered reasons did not actually motivate his discharge; or third, by showing that the proffered reasons were insufficient to motivate his discharge." *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) ).

Plaintiff argues that a prima facie case is established.  Defendant asserts that neither the second nor the third elements are met.[2]  For the following reasons, the Court assumes plaintiff has presented enough evidence to show an issue of fact as to whether the prima facie case has been established.

Relative to the second element, upon expiration of his FMLA leave plaintiff was laid off and, although ultimately recalled, was separated from employment when he failed to get medical approval for a return to work. Thus, he shows that he was adversely affected by an employment decision. With regard to the third element, plaintiff argues that Alexander's alleged statement made just prior to beginning his FMLA leave that there would not be a job waiting for plaintiff when he returned from leave establishes a causal connection.  There is, at a minimum, an issue of fact as to this element.

Defendant has asserted legitimate reasons for its adverse decisions.  Plaintiff was laid off among other employees and was chosen for layoff as the least senior maintenance technician.  When a position for a maintenance technician subsequently opened, plaintiff was notified but was required to take a physical examination because of his history of back problems and defendant's need for an immediate maintenance technician.  Ultimately,

---

[2]  It is undisputed that the first element is met.

15

plaintiff was separated from employment in accordance with defendant's policy regarding layoff status.

Plaintiff argues that Dr. Altemus's opinion was a pretextual basis for terminating him.[3] The Court disagrees.

Plaintiff asserts that although Dr. Altemus indicated that "the type and strength" of plaintiff's medication created a problem, his deposition testimony shows that he did not know the precise strengths of plaintiff's medication.  Dr. Altemus, however, testified that plaintiff told him he took 40 milligrams of OxyContin once daily.  He also testified that as of the time of the deposition, he did not know the dosage of the Fentanyl patch.  (Altemus depo. 24-25, 27)

Plaintiff also asserts that while Altemus referred to the Physician's Desk Reference as the basis for his opinion that plaintiff was automatically disqualified from employment as a result of his potential impairment of perception or judgment, those portions of the Physician's Desk Reference do not justify such.   Dr. Altemus, however, testified:

> Q.  So would it be accurate to say that you concluded that somebody who was taking this level of medications would, per se, be unable to perform this particular job?
>
> A.  No, that's not the gist of this at all.  The gist is that he could do the job, however, there is no way to tell what the next day would be.  He does not have to give you all or nothing.  You don't know when your perception is going to be off-base.
>
> Q.  So would it be safe to say that anybody who is taking these medications, you would exclude from this job because of that?
>
> A.  Absolutely.  And it wouldn't even have to be these medications.
>
> Q.  What type of medications would it be?

---

[3]  Plaintiff does not appear to dispute that defendant's layoff was legitimate.

16

>    A.  Anything that has a chance to change your perception.  Hydrocodone, Oxycodone, Phenobarbital, any of the barbiturates, things of that type, Type II, III narcotics, maybe even a Type IV.
>
>    Q.  And you believe that that's supported by the documentation contained in the Physicians' Desk Reference?
>
>    A.  I surely do.

(Altemus depo. 26-27)

Plaintiff further points to the report written by Dr. Franklin which opines, "The mere fact that an individual is taking long-acting opioids does not in my opinion operate to exclude that person from the workplace."  (Doc. 34 Ex. 2)

Even assuming Dr. Altemus had a motivation to concoct a reason preventing plaintiff's return to work, there is no evidence that defendant did not honestly rely on his opinion and assume it was not safe for plaintiff to return to work until his medications had been reduced.

Plaintiff argues that because Dr. Altemus was a physician regularly used by defendant, his opinion was "essentially solicited" by it and was not independent, especially considering that Alexander had already expressed frustration with the amount of work missed by plaintiff.  For the following reasons, the Court does not find that the evidence supports this supposition.

Plaintiff does not address the fact that he was legitimately laid off based on his seniority, along with employees in other departments.  Subsequently, although Alexander allegedly harbored animus toward plaintiff, he made the decision to call plaintiff when a position for maintenance technician again became open.  Due to plaintiff's history of back problems and defendant's immediate need for a maintenance technician, defendant was reasonable in its requirement that plaintiff complete the physical examination.  There is no

17

evidence that defendant did not honestly rely on Dr. Altemus's recommendation.  Thereafter, plaintiff, did not provide a statement to defendant that his medication had been reduced, as requested by defendant. Although Dr. Franklin provided a statement to defendant shortly after plaintiff was notified by defendant of this requirement, the statement did not express that plaintiff's medication had been reduced but that plaintiff was "stable on long term opoid management for chronic pain and is able to do the same work he has been doing on this medication in recent years."  Plaintiff, obviously cognizant of the return-to-work requirement, telephoned defendant about one month later and stated that his physician had reduced his medication.  When asked to provide a statement from his doctor indicating what medication he was on and the quantity of dosage, plaintiff refused to do so.  Nor did plaintiff supply the information in response to defendant's April 22 letter which again requested such.

Accordingly, plaintiff fails to show pretext.

For these reasons, summary judgment is warranted on Count Three.

**Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/6/06